**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 09-cv-02822-CMA-BNB

ELSA BERHANU,

      Plaintiff,

v.

ARAPAHOE COMMUNITY COLLEGE,

      Defendant.

---

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

This matter is before the Court on Defendant Arapahoe Community College's Motion for Summary Judgment.  (Doc. #22).  For the following reasons, the Motion is granted.

## I. PROCEDURAL HISTORY

This action arises from Defendant's termination of Plaintiff Elsa Berhanu from her job as the Lead Cashier in Defendant's Cashier's Office.  On December 2, 2009, Plaintiff filed a Complaint in Arapahoe County District Court alleging one claim for relief for employment discrimination under Title VII of the Civil Rights Act of 1964.  (Doc. # 1-3.)  On December 2, 2009, Defendant timely filed a Notice of Removal, removing the action from state court on grounds that this Court has original jurisdiction over Plaintiff's Title VII claim.  (Doc. # 1.)  On September 27, 2010, Defendant filed the

instant Motion for Summary Judgment.  (Doc. # 22.)  Plaintiff responded on October 18,

2010 (Doc. # 23) and Defendant replied on November 1, 2010 (Doc. # 24.)

## II.  <u>FACTUAL BACKGROUND</u>[1]

Plaintiff is an African American woman of Ethiopian origin whom Defendant hired

in September, 2003.  Plaintiff was assigned to Defendant's Cashier's office as an

Accounting Technician Level II; her initial supervisor was Elizabeth Jesmer.  In the

spring of 2004, Ms. Jesmer conducted Plaintiff's first performance evaluation; she

was found to exceed expectations or be fully competent in all respects except in her

communication skills, for which she received a "needs improvement" rating.[2]  (Doc.

# 22-10).  Despite Plaintiff's noted communication problems, the evaluation commended

Plaintiff for being "regularly courteous" to Defendant's students.

In November of 2004, Defendant hired Dorothy Shallcross as Lead Cashier, in

which position Ms. Shallcross supervised Plaintiff.  In the spring of 2005, Ms. Shallcross

conducted Plaintiff's 2004-05 performance evaluation.  Ms. Shallcross gave Plaintiff

a "fully competent" rating for her communication skills and noted, "Elsa has good

interpersonal skills.  She is not shy and is willing to communicate verbally and in written

form.  She has been considered 'rude' and even 'mean' by students and other

---

[1]   Unless otherwise noted, the following facts are undisputed and are taken from the parties' pleadings, briefs, and attached exhibits.  Although no affidavits have been submitted concerning the exhibits' authenticity, neither party has objected to the authenticity or the information contained therein.

[2]   Pursuant to the evaluation form, "needs improvement" means that the employee "does not demonstrate good verbal and written skills and avoids communication in difficult situations."  (Doc. # 22-10 at 2.)

departments.  This is due to her accent.  She is encouraged to continue to work on her verbal and written communication skills."  (Doc. # 22-11 at 2.)  In overall remarks, Ms. Shallcross further commented that Plaintiff is "a very conscientious employee and presents herself in a professional manner. . . .  She works to assure 3rd Party Billing is timely and accurate and continually works to resolve outstanding balances. . . .  Elsa's most significant weakness is her communication skills.  Her 'heavy' accent cause [sic] some of her verbal and written communication to be misinterpreted."  (*Id.* at 7.)  In all other respects, Plaintiff received "exceeds expectations" or "fully competent" ratings.

In December 2005, Ms. Shallcross recommended Plaintiff for, and Plaintiff ultimately received, a promotion to Accounting Technician III based on Plaintiff's proficiency as an Accounting Technician Level II.  In the spring of 2006, Ms. Shallcross conducted Plaintiff's first performance evaluation as an Accounting Technician Level III for the period covering July 1, 2006 to March 31, 2006.  Overall, Ms. Shallcross gave Plaintiff a "fully competent" rating and noted as follows:

> Due to the turn over of the personnel in the cashier and accounting office [Plaintiff] has been forced to assume responsibilities for which she had little or no training.  She works with management and other employees of the cashier's office to support a team environment; provide service to the students . . . and meet time frames associated with the job duties of her desk. [Plaintiff] presents herself in a professional manner. [Plaintiff] has been a good example of accepting and helping to implement the changes in the cashier's office.  This includes specific assignment of cashing and having a constant presence at the cashier's window during the assigned hours.  She communicates effectively both verbally and in written form; however, [Plaintiff] has opportunities for growth in the areas of verbal communication due to her accent.

(Doc. # 22-14 at 6.)

3

In April of 2006, Ms. Shallcross was promoted to Director of Student Financial Services and she recommended Plaintiff as her replacement in the Lead Cashier position because, based on her experience supervising Plaintiff, she believed that Plaintiff had the experience and ability to succeed.  In this new position, Plaintiff was required to supervise the Cashier's Office staff, which included training the staff to take over many of her former responsibilities; ensuring the staff's understanding of policies and procedures; delegating tasks such as recording third party billing, recording students' tuition payments, and making any changes to tuition payment plan contracts; overseeing the timely and accurate processing of all receipts; ensuring accuracy, timeliness, and completeness of journal entries; and ensuring accurate recording of student tuition payments.  (*See* Doc. ## 22-17, 22-18, 22-19.)

On January 24, 2007, Ms. Shallcross met with Plaintiff to discuss problems related to the timely and accurate reporting of payments made to the office and staff training.  About four months later, in May 2007, Ms. Shallcross conducted Plaintiff's performance evaluation as Lead Cashier and noted continued problems related to reporting of payments, staff training, and delegation of responsibility.  Ms. Shallcross also noted Plaintiff's practice of leaving work during business hours with the Cashier's Office staffed only by junior employees.  (Doc. ## 22-5, ¶ 17; 22-20 at 1).  Based on the foregoing, Ms. Shallcross gave Plaintiff an overall "unsatisfactory" rating and identified the following areas for improvement:

(1)     A need to assume full responsibility for the basic job duties of the Lead Cashier position;

(2)     An improved grasp of the English language to foster more effective communication with staff members;

(3)     Ensure all receipts are recorded timely by making certain that questions on deposits do not go unanswered;

(4)     Improve accuracy of data entries into spreadsheets of daily financial activity; errors have consisted of typing errors, descriptions that are too many characters for the spreadsheet field, and account code errors; and

(5)     Ensure that all work completed in the Cashier's Office is completed within the acceptable time frames.

(Doc. # 22-20 at 2-4.)  At the end of the meeting concerning the May 2007 evaluation, Plaintiff signed a Performance Goal and Objective Planning Form for Administrators that listed the following goals and objectives for Plaintiff to accomplish by May 31, 2008, the end of the next evaluation period:

(1)     Assume full responsibility of the Lead Cashier position;

(2)     All of the classified staff at the Cashier's Officer should be trained and have assumed full responsibility of FACTS[3] and Third Party Billing by Fall Term;

(3)     Oversee the timely and accurate processing of all receipts taken into the Cashier's Office;

(4)     Verify 030 and 060 journal entries[4] are timely, accurate and complete; and

(5)     Documentation of all BANNER and cashiering processes.

--------

[3]   FACTS is a student tuition payment plan.  (*See* Doc. # 22-6 at 8:7-12.)

[4]   30/60 journal entries are entries recording cash and miscellaneous receipts, taken in by the Cashier's Office that are recorded and forwarded to the accounting office.  (*See* Doc. # 22-6 at 17:3-18.)

(Doc. # 22-22.)  Plaintiff and her supervisor agreed to meet twice a month to evaluate Plaintiff's progress on the established goals and objectives, with the first meeting to occur in July, 2007.  (*Id.*)

Plaintiff failed to make any significant progress with respect to these goals, and on November 27, 2007, Ms. Shallcross and Theresa Bryant, of Defendant's Human Resources/Employee Relations Department, met with Plaintiff to discuss her continued lack of progress and to outline steps for improved performance ("November 27 Performance Review").  (Doc. # 22-9, ¶ 7; Doc. # 22-24.)  During the meeting, Ms. Shallcross presented Plaintiff with a mid-year evaluation for Plaintiff's signature, which evaluation noted Plaintiff's shortcomings and gave Plaintiff an "unsatisfactory" rating, indicating that Plaintiff's job "[p]erformance is not meeting the expectations of the job.  Goals are consistently not achieved.  (A mid-year performance evaluation with specific written guidelines for performance improvement is required.)"  (Doc. # 22-26.) The next day, Ms. Shallcross sent Plaintiff an e-mail summary of the meeting, which detailed Plaintiff's performance expectations and scheduled another meeting to re-evaluate Plaintiff's progress.  (Doc. # 22-27.)  On November 30, 2007, Plaintiff signed a "Written Warning," which identified the areas of needed improvement and identified the following five specific tasks that Plaintiff must accomplish by a date certain to improve her performance ("Areas of Improvement"):

    (1)    To maintain an error rate of no more than one error per week on the 060 and 030 entries;

(2)    Place on the shared network drive for the Cashier's Office a series of process documentation memos by December 3, 2007;

(3)    Provide a training document for all Account Tech I employees under Plaintiff's supervision, which document should show the areas and dates of training;

(4)    All cash receipts received in the Cashier's Office by noon on Friday are to be posted to the correct account by the end of that Friday's business day;

(5)    Within three weeks from the November 27 Performance Review, *i.e.*, by December 17, 2007, collect 75% of outstanding third party balances owed by various institutions.

(Doc. # 22-25.)  These were the same areas in which Plaintiff was found to have been deficient in May 2007.  Although Plaintiff now asserts that these tasks were "nearly impossible" to complete, (Plaintiff's Statement of Facts, Doc. # 23, ¶ 23), there is no dispute that Plaintiff never objected to the timeline in which she was to accomplish the assigned tasks and show improvement in the identified areas.

On December 4, 2007, Ms. Shallcross and Ms. Bryant met with Plaintiff and again noted that Plaintiff still had not made substantial progress towards her goals and objectives.  The extent of Plaintiff's lack of progress was documented in a Progress Form that Plaintiff signed on December 4, 2007.  (Doc. # 22-29.)  The next day, Ms. Bryant sent Plaintiff an e-mail summary of the meeting and scheduled another meeting to re-evaluate Plaintiff's progress.  (Doc. # 22-30.)

A subsequent meeting occurred on December 11, 2007, during which Ms. Shallcross and Ms. Bryant again presented Plaintiff with a "Performance Plan Follow Up Tracking" form, which identified the five Areas of Improvement and noted

7

Plaintiff's status.   (Doc. # 22-32.)  In the first four of the five Areas of Improvement,

Plaintiff's status was "ongoing," and, with respect to collection of 75% of third party

balances, Plaintiff's status was noted as "researching;" in sum, Plaintiff appeared to

have made limited progress.  A new completion date of December 18 was set for the

first four Areas of Improvement and December 17 was set for the fifth Area, collection of

third-party balances.  Plaintiff signed the form and did not insert any comments in

a section that allowed for an employee response or additional notes.  As with other

meetings, Ms. Bryant sent Plaintiff an e-mail summary of the December 11 meeting

and scheduled a subsequent progress meeting.  (Doc. # 23-33.)  The e-mail summary

identified Plaintiff's insubstantial progress as follows:

> (1)    Accuracy of 030 and 060 entries - "On-going.  3 errors occurred.
> Spreadsheet wasn't updated but [Plaintiff] called Tammy McGinnis
> regarding one of the errors to correct prior to posting."
>
> (2)    Process Documentation - "One complete and on shared drive
> (Child care).  3 are in process one of which is on shared drive
> (EBT)"
>
> (3)    Training documents - "Ongoing. Document to be split out for each
> individual trained, so it can be added to their files."
>
> (4)    Posting of all payments received in the cashier's office - "Issues still
> occurring. [Plaintiff] will discuss with employees.  It was suggested
> that the employee run things by [Plaintiff] first so she can ensure
> proper posting."
>
> (5)    Resolving third party balances in SIS - "Due 12/17, feels she can
> accomplish the requested 75% completion by due date.  Feels
> some have been resolved."

(*Id.*)

On December 18, 2007, a subsequent meeting was held.  Once again, Ms.
Bryant presented Plaintiff with a "Performance Plan Follow Up Tracking" form, which
identified the five Areas of Improvement and noted Plaintiff's "ongoing" status.   (Doc.
# 22-35.)  Plaintiff failed to make much progress in training her staff, issues remained
with Plaintiff's failure to ensure same-day posting of cash receipts, and Plaintiff still had
a lot more work to do in connection with collecting 75% of third party balances.  January
2008 was set as the new completion deadline.  As in previous instances, Plaintiff signed
the form and did not insert any comments.  (*Id.*)  Once again, Ms. Bryant sent Plaintiff
an e-mail summary of the progress meeting.  (Doc. # 23-36.)  In pertinent part, she
noted that Plaintiff has "made minimal progress," Plaintiff was informed of the
seriousness of not attending to her duties and the importance of making a concerted
effort to resolve each item; and Plaintiff stated that she understood and that she had
no questions.  (Doc. #22-36).  With respect to each of the Five Areas of Improvement,
Ms. Bryant noted as follows:

> (1)  Accuracy of 030 and 060 entries - Plaintiff's entries were "[w]ithin
>      acceptable limits for the past week."
>
> (2)  Process Documentation - Task was still incomplete and some
>      irrelevant process documents were posted.
>
> (3)  Training Documents - Training of staff was improperly conducted
>      without process documentation.[5]

---

[5]  Although Plaintiff asserts that she "undertook to train all Cashier's Office staff members as required by her action plan and submitted documents signed by her coworkers verifying that they had completed training," Plaintiff does not dispute that she trained staff members on certain Cashier's Office processes without first documenting the processes and using that documentation for training purposes.  (*See* Plaintiff's Statement of Facts, Doc. # 23, ¶ 26.)

(4)     Posting of all payments received in the Cashier's Office - In some instances, the Cashier's Office was in non-compliance of timely posting; some payments received eleven days prior had not been posted.

(5)     Resolving third party balances in SIS - No progress has been made, even though this item has been an issue since June without action; Plaintiff will devote 1-2 hours per day to accomplish this task.

A subsequent meeting occurred on January 28, 2008.  (Doc. # 22-38.)  Once again, Plaintiff failed to make any substantial progress; her progress in the Five Areas of Improvement were as follows:

(1)     Accuracy of 030 and 060 entries - Accounting had discovered several instances of inaccurate data entries and had to correct these errors before closing their December books.

(2)     Process Documentation - "No change."

(3)     Training Documents - "No change."

(4)     Posting of all payments received in the Cashier's Office - "Issues still occurring" with late posting of payments received.

(5)     Resolving third party balances in SIS - "No progress from last meeting."[6]

(*Id.*)  As in previous instances, Plaintiff signed, without comment, the "Performance Plan Follow Up Tracking" form, which recorded Plaintiff's lack of progress in the Five Areas of Improvement.  (Doc. # 22-39.)  On February 2, 2008, Plaintiff was terminated by Joseph A. Lorenzo, Jr., Defendant's Chief Financial Officer.

---

[6]   When Plaintiff first started working in the Cashier's Office, outstanding third party balances totaled over $500,000.  As of the January 28 progress meeting, the outstanding balances totaled $78,000.  However, Plaintiff failed to make any progress on this item since her May/June 2007 performance review.  (Doc. # 22-38 at 1.)

### III.  STANDARD OF REVIEW

The purpose of a summary judgment motion is to assess whether trial is necessary.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Fed. R. Civ. P. 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure of materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson*, 477 U.S. at 252.

"The movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998) (citing *Celotex*, 477 U.S. at 323). The "movant may make its prima facie demonstration [of the absence of a genuine issue of material fact] by simply pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim."

11

*Ia.* at 671.  After the movant has met its initial burden, the burden shifts to the nonmovant to put forth sufficient evidence for each essential element of the claim such that a reasonable jury could find in its favor.  *See Anderson*, 277 U.S. at 248; *Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs.*, 165 F.3d 1321, 1326 (10th Cir. 1999).  The nonmovant must go beyond the allegations and denials of his pleadings and provide admissible evidence,[7] which, as mentioned, the Court views in the light most favorable to the nonmovant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995) (citing *Celotex*, 477 U.S. at 324).  However, conclusory statements based merely on conjecture, speculation, or subjective belief are not competent summary judgment evidence. *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

## IV.  ANALYSIS

In her Complaint, Plaintiff alleges disparate treatment under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*; specifically, Plaintiff asserts that Defendant terminated her because of her racial or ethnic background, rather than because of her failure to fulfill the duties of her job.  (Doc. # 1-3 at 2-3.)  Title VII prohibits an employer from discriminating against any individual on the basis of race, color, religion, sex, or national origin.

---

[7]   While the parties need not present evidence "in a form that would be admissible at trial, [ ] the content or substance of the evidence must be admissible."  *Thomas v. Int'l Bus. Machs.*, 48 F.3d 478, 485 (10th Cir. 1995).

## A.      THE BURDEN-SHIFTING FRAMEWORK

To prevail on a claim of discrimination under Title VII, a plaintiff must prove by a preponderance of the evidence that the defendant engaged in intentional discrimination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993). A plaintiff may prove intentional discrimination by either direct or circumstantial evidence. *Id.* In the instant case, Plaintiff has no direct evidence of discrimination; therefore, the Court applies the three-step analysis set forth in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See also Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). Under that three-step analysis, a plaintiff must first establish a *prima facie* case of discrimination by showing that: (1) she belongs to a protected class; (2) she was qualified and satisfactorily performing her job; (3) she suffered an adverse employment action; and (4) such adverse action occurred in circumstances giving rise to an inference of discrimination. *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 & n.5 (10th Cir. 2005).[8] The plaintiff need only show that she was minimally qualified for the job using objective criteria, such as education or experience; subjective criteria, such as strengths at particular skills, are not appropriate at the *prima facie* stage.

---

[8]   Both parties assert that, in order to establish a *prima facie* case of discriminatory termination, the plaintiff must present evidence that similarly-situated employees were treated differently. *See* Doc. # 22 at 14; Doc. #23 at 7 (citing to *Trujillo v. Univ. of Colo Health Scis. Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998) (identifying the elements of a *prima facie* case as follows:  (1) the plaintiff is a member of a protected class; (2) the plaintiff suffered an adverse employment action; and (3) similarly-situated employees were treated differently)). However, as noted in *Sorbo v. United Parcel Serv.*, 432 F.3d 1169, 1173 & n.5 (10th Cir. 2005), this is an outmoded version of the *prima facie* case test, and a plaintiff need not show, at the *prima facie* stage, disparate treatment as compared to similarly-situated employees, although such evidence is one way a plaintiff can establish an inference of discrimination.

*Stockman v. Koch Indus., Inc.*, No. 97-1464, 2000 U.S. Dist. LEXIS 4382, at *25

(D. Kan. Feb. 16, 2000) (unpublished) (citing *Thomas v. Denny's, Inc.*, 111 F.3d 1506,

1510 n.6 (10th Cir. 1997); *Ortega v. Safeway Stores, Inc.*, 943 F.2d 1230, 1239 n.19

(10th Cir. 1991); *Mistretta v. Sandia Corp.*, 649 f.2d 1383, 1389 (10th Cir. 1981)).

An inference of discriminatory motive can arise from various circumstances, including

actions or remarks made by decision makers that could be viewed as reflecting a

discriminatory animus, or preferential treatment given to employees outside the

protected class. *Plotke v. White*, 405 F.3d 1092, 1101 (10th Cir. 2005). Although

"courts must be sensitive to the myriad of ways such an inference can be created,"

there must at least be a logical connection between the elements of the *prima facie*

case and the illegal discrimination. *Hysten v. Burlington N. & Santa Fe Ry. Co.*, 296

F.3d 1177, 1181-82 (10th Cir. 2002) (internal quotations omitted) (quoting *E.E.O.C. v.*

*Metal Serv. Co.*, 892 F.2d 341, 348 (3d Cir. 1990)).

If the plaintiff meets this burden of establishing a *prima facie* case, the burden

shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the

termination. 296 F.3d at 1181-82. If the defendant satisfies this burden, then the

burden shifts back to the plaintiff to show that the defendant's proffered reasons are

pretextual. *Id.* Pretext may be established with evidence showing one of three

situations: (1) the defendant's stated reason for the termination was false; (2) the

defendant acted contrary to a written company policy prescribing the action taken by the

defendant under the circumstances; or (3) the plaintiff was treated differently from other

14

similarly-situated employees who violated work rules of comparable seriousness.

*Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000).

Summary judgment for the defendant is warranted only if the plaintiff has "failed to

produce any evidence from which a reasonable inference could be drawn" that the

defendant's proffered reasons were pretextual. *Salguero v. City of Clovis*, 366 F.3d

1168, 1176 (10th Cir. 2004).

**B.      PLAINTIFF FAILED TO ESTABLISH A *PRIMA FACIE* CASE**

Conducting the aforementioned analysis, the Court finds that Plaintiff has failed

to establish a *prima facie* case of unlawful termination.  There is no dispute that Plaintiff

belongs to a protected class and that she was terminated.  However, Plaintiff has not

identified competent evidence that, if taken as true, would establish circumstances

giving rise to an inference of discrimination.  Plaintiff claims that Ms. Shallcross

terminated her because of her race or ethnicity, but the evidence presented is

conclusory and speculative.  Plaintiff contends that Ms. Shallcross once declared, upon

realization that she was to supervise Plaintiff, "Oh, my God, I'm going to have to work

with her?"  Plaintiff also asserts that Ms. Shallcross prevented her active participation in

meetings and made "derogatory comments" to other employees about Plaintiff's accent.

Ms. Shallcross denies making these statements and preventing Plaintiff's active

participation in meetings.  More importantly, Plaintiff fails to identify with specificity, the

alleged derogatory comments and this allegation's vague and unsupported nature

warrants no weight.[9]  With respect to Ms. Shallcross's supposed surprise at having to work with Plaintiff and prevention of Plaintiff's active participation at meetings, these facts do not reveal a discriminatory motive.  Rather, interpreted in the light most favorable to Plaintiff, it suggests a personal animus, which cannot be a basis for a Title VII discrimination claim.  *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1406 (10th Cir. 1997) (stating that animus arising from a personality conflict is not evidence of improper discrimination); *Parker v. Hous. Auth. of Kansas City, Kan.*, No. 92-3136, 1993 WL 207441, at *4 (10th Cir. June 9, 1993) (unpublished) (stating the same).  However, Ms. Shallcross's recommended promotion of Plaintiff on two occasions undercuts any suggestion of personal animus.  Further, Plaintiff has not shown a nexus between Ms. Shallcross's alleged statements and Defendant's termination decision,[10] or that Ms. Shallcross's purported attempts to prevent Plaintiff's active participation in meetings inhibited Plaintiff's ability to perform her job.  Therefore, based on the foregoing, the Court finds that Plaintiff has failed to establish a *prima facie* case of discriminatory termination.

---

[9]  In support of the "derogatory comments," Plaintiff refers to Doc. #23-2, the Affidavit of Ruth Martinez.  However, Plaintiff exaggerates the contents therein.  According to Ms. Martinez, Ms. Shallcross simply commented that Plaintiff's accent renders communication difficult.  (Doc. # 23-2, ¶ 12.)

[10]  *See Cone v. Longmont United Hosp. Ass'n*, 14 F.3d 526, 531 (10th Cir. 1994) (stating, "[i]solated comments, unrelated to the challenged action, are insufficient to show discriminatory animus in termination decisions"); *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1129 (10th Cir. 1998) (stating, "In order to rely on [allegedly discriminatory] statements, [the plaintiff] must show that they are made by a decision maker, and that there was a nexus between the discriminatory statements and the decision to terminate.")

**C.     DEFENDANT'S PRESENTATION OF A LEGITIMATE, NON-DISCRIMINATORY REASON**

Even if Plaintiff had established a *prima facie* case of discriminatory termination, the Court finds that Defendant is entitled to summary judgment because it presented evidence of a legitimate, non-discriminatory reason for Plaintiff's termination, and Plaintiff has failed to establish that Defendant's proffered reason was pretextual.

Defendant has presented considerable evidence of Plaintiff's consistent failure to perform adequately her job as Lead Cashier, despite numerous opportunities for improvement, during a seven-month period, and meetings in which Ms. Shallcross and Ms. Bryant coached Defendant on how to improve her job performance.  While Plaintiff's prior success in her job enabled her to rise to the level of Lead Cashier, her inadequate performance in that last position was sufficiently documented and presents a legitimate business reason for Defendant to have terminated Plaintiff.  Plaintiff intimates that Ms. Shallcross imposed increasingly unreasonable demands on her, "as a precursor to facilitating" her termination.  (Doc. # 1-3 at 3.)  However, Plaintiff has not presented any evidence that, at any time, she thought the demands were unreasonable; in actuality, the uncontroverted evidence presented reveals that Plaintiff raised no objections and agreed to various deadlines in which to complete certain tasks.

Finally, even if Ms. Shallcross somehow disliked or disapproved of Plaintiff because of her race or ethnicity, the termination decision was made by Joseph Lorenzo, Jr., Defendant's Chief Financial Officer; Plaintiff has presented no evidence that Mr. Lorenzo possessed a discriminatory motive for Plaintiff's termination.  "[A] challenge of

pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff." *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1231 (10th Cir. 2000) (citing *Shorter v. ICG Holdings, Inc.*, 188 F.3d 1204, 1209 (10th Cir. 1999)) (noting that it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext)).  Further, Plaintiff does not argue that Mr. Lorenzo was simply "a rubber stamp or conduit for an employment decision [premised on a discriminatory intent] made in reality by underlings." *Id.* at 1231 (acknowledging the principle of defendant employer liability for a manager's termination decisions that rubber stamp a subordinate employee's prejudice).  Therefore, based on the foregoing, the Court finds that Defendant has presented a legitimate, non-discriminatory reason for Plaintiff's termination.

## D.    PLAINTIFF'S FAILURE TO ESTABLISH PRETEXT

A reason to terminate is not pretextual "unless it is shown both that the reason was false, and that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) (original emphasis omitted).  "The relevant inquiry is not whether [the employer's] proffered reasons were wise, fair or correct, but whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999), *abrogation on other grounds recognized by Boyer v. Cordant Techs., Inc.*, 316 F.3d 1137 (10rth Cir. 2003).  A plaintiff may present evidence that she was treated differently from similarly-

situated, non-protected employees to support a claim of pretext. *See Smith v. State of Okla. ex rel. Tulsa County Dist. Attorney*, 245 F. App'x 807, 814 (10th Cir. 1007) (unpublished); *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000). "Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance evaluation and discipline." *Wilson v. Utica Park Clinic, Inc.*, 76 F.3d 394 (10th Cir. 1996). Employees who hold different positions with different job duties are not similarly-situated. *Medina v. Denver Pub. Sch.*, No. 05-cv-00299, 2006 WL 1795126, at *5 (D. Colo. June 27, 2006) (unpublished) (citing *Miller v. Auto. Club of N.M., Inc.*, 420 F.3d 1098, 1115 (10th Cir. 2005)).

In the instant case, Plaintiff has failed to identify a similarly-situated employee who engaged in comparably serious conduct at work, but was more favorably treated by Defendant. Plaintiff has identified two employees, Thad Spaulding and Ms. Shallcross, but they are not similarly-situated employees. (Doc. # 23 at 9.) Plaintiff asserts that Mr. Spaulding is similarly-situated because he, like Plaintiff, was supervised by Ms. Shallcross and was subject to the same standards governing performance evaluation and discipline, but was afforded greater leniency to work flexible hours. (*Id.* at 11). However, Plaintiff has presented no evidence that Mr. Spaulding has similar job duties as Plaintiff. Rather, Plaintiff asserts that they supervised two different departments – she managed the Cashier's Office and he managed the Financial Aid Office, Plaintiff's Statement of Facts, Doc. # 23, ¶ 12); Defendant's evidence reveals

19

that these two positions had different responsibilities and different job descriptions. *Compare* Coordinator Cashier's Office Position Description, Doc. # 22-18, *with* Associate Director of Financial Aid Position Description, Doc. # 24-2.   Additionally, Plaintiff has presented no evidence that these offices had the same workloads and staffing or supervisory needs, and that Mr. Spaulding engaged in comparable conduct as Plaintiff, but received more favorable treatment, *i.e.*, that Mr. Spaulding failed to perform satisfactorily his work duties and was not terminated.  Even if Mr. Spaulding was similarly situated, his working flexible hours is not comparable to the conduct for which Plaintiff was terminated, namely a failure to perform adequately her duties.

Similarly, Plaintiff's identification of Ms. Shallcross as a similarly-situated employee is deficient.  Plaintiff asserts Ms. Shallcross is similarly situated because she once held the Lead Cashier position.  However, Ms. Shallcross, who supervised Plaintiff prior to her termination, obviously had a different supervisor during her tenure as Lead Cashier.  Additionally, Plaintiff has presented no evidence that the same standards governing the Lead Cashier's performance evaluation that applied during Ms. Shallcross's tenure as Lead Cashier also applied during Plaintiff's tenure.  Rather, the evidence presented reveals that Ms. Shallcross imposed stricter standards when she became the supervisor of the Lead Cashier position.  To the extent that Plaintiff believes that Defendant unlawfully imposed more stringent standards on her than on prior Lead Cashiers, "the federal discrimination laws do not require employers to treat all employees equally; rather, they prohibit employers 'from meting out unequal

20

treatment based on race.'" *Clark v. Atchison, Topeka & Santa Fe Ry. Co.*, 731 F.2d 698, 702 (10th Cir. 1984).  Plaintiff has not shown that Defendant meted out unequal treatment based on race or ethnicity.

## V.  <u>CONCLUSION</u>

The Court finds that summary judgment in Defendant's favor is warranted. Plaintiff has failed to establish a *prima facie* case of discriminatory termination; alternatively, Plaintiff has failed to establish the pretextual nature of Defendant's legitimate, non-discriminatory reason for terminating her.

Accordingly, IT IS ORDERED THAT:

(1)    Defendant's Motion for Summary Judgment (Doc. #22) is GRANTED;

(2)    This case is DISMISSED WITH PREJUDICE;

(3)    The parties shall bear their own fees and costs; and

(4)    The Final Trial Preparation Conference, set for March 14, 2011, and the four-day jury trial, set to commence March 28, 2011, are VACATED.

DATED:  February   28  , 2011

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge